Gary JACKSON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0205–CR–413.

Court of Appeals of Indiana.

March 24, 2003.

was sufficient evidence to support the trial court's finding that Heald was gravely dis-abled.

Steven J. Halbert, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Zachary J. Stock, Deputy Attor-

ney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.[1]

### Case Summary

Gary (Van) Jackson appeals his conviction for Carrying a Handgun Without a License as a Class A misdemeanor, which was enhanced to a Class C felony because of a prior felony conviction. Specifically, Jackson argues that the trial court erred in not suppressing the handgun found during a police search of his vehicle because the initial traffic stop of his vehicle was unjustified. Jackson also argues that even if the initial stop was valid, the police exceeded the scope of the stop by conducting multiple protective searches of his vehicle. Because in this case the use of multiple protective searches of Jackson's vehicle was unreasonable, we find that the trial court abused its discretion in failing to suppress the handgun.

### Facts and Procedural History

Shortly after noon, on November 10, 1997, Indianapolis Police Officer Jeffery Krider observed a black Buick Regal driven by Jackson enter the northbound middle lane of Fall Creek Parkway. Depending on the time of day, the middle lane of Fall Creek Parkway is used exclusively for northbound or southbound traffic. When the lane is open for traffic, lane use control signals display a green arrow to oncoming traffic; and when the lane is closed, a red "X" is displayed.[1] After observing that northbound traffic faced a red "X" in the middle lane, Officer Krider decided to stop Jackson. However, by the time Officer Krider initiated the traffic stop, Jackson had already pulled into a gas station.

Upon pulling into the gas station, Jackson parked next to a gas pump and exited his car. Officer Krider parked his car behind Jackson's and asked him to get back into his car, which Jackson did. After Jackson reentered his car, Officer Krider observed Jackson lean over toward the passenger side of his car while moving his right elbow up and down four or five times. Fearing that Jackson was trying to get a weapon, Officer Krider drew his own gun and began yelling at Jackson, "Get your hands up! Get your hands up!"; however, Jackson continued his movement. Tr. p. 66–67. During this time, Lieutenant Sheyrl Turk arrived on the scene and also ordered Jackson to raise his hands in the air. Eventually, after moving around in his car for ten to fifteen seconds, Jackson raised his hands. Officers Krider and Turk removed Jackson from his car at gunpoint.

Once Jackson was outside his car, Officer Krider performed a patdown search of Jackson, which revealed no weapons. Officer Krider then took Jackson's driver's license, and after noting some discrepancies between Jackson's physical appearance and the information on his license, Officer Krider took Jackson to his patrol car to check the information on the license. During this time, numerous police officers arrived and then departed from the scene. Among the officers who arrived at the scene were Officer Stephen Butler and Officer Joseph Brannon, a canine officer.

After arriving, Officer Brannon searched the inside of Jackson's car with his canine. Officer Brannon's canine did not signal during the search, no weapons were discovered during this search, and Officer Brannon returned the canine to his own vehicle. After Officer Brannon had returned the canine to his vehicle, Officer Butler arrived on the scene. Officer Kri-

---

1. Ind.Code § 9–21–3–9.

der then instructed Officer Butler to perform a cursory search of Jackson's car. As Officer Butler searched Jackson's car, he noticed that the zipper on the passenger side seat was partially open. Upon reaching his hand inside the seat, Officer Butler discovered a handgun.

On November 19, 1997, the State charged Jackson with Carrying a Handgun Without a License as Class A misdemeanor[2] with an enhancement to a Class C felony because of a prior felony conviction.[3] On February 19, 1998, the State filed a habitual offender allegation.[4] Jackson filed a motion to suppress the evidence found during the search of his car. Following a hearing on his motion to suppress on February 20, 1998, the trial court denied Jackson's motion. Just before his jury trial, Jackson filed a motion to reconsider the motion to suppress, which the trial court also denied. On May 27, 1999, a jury found Jackson guilty of Carrying a Handgun Without a License as a Class C felony, but the trial court declared a mistrial as to the habitual offender portion of the trial. On April 26, 2002, the trial court sentenced Jackson to an executed sentence of eight years. This appeal ensued.

### Discussion and Decision

On appeal, Jackson raises a number of issues, one of which we find dispositive. Jackson argues that the trial court abused its discretion in failing to suppress the handgun found in his car because it was discovered in violation of his rights against unreasonable search and seizure under the Fourth Amendment of the United States Constitution and Article I, Section 11, of the Indiana Constitution. Specifically, Jackson asserts that the trial court erred in failing to suppress the handgun because the initial traffic stop was invalid and al-

ternatively because the use of multiple protective searches of his car was unreasonable.

The Fourth Amendment protects against unreasonable search and seizure and requires a warrant before a search is conducted. *Swanson v. State*, 730 N.E.2d 205, 208 (Ind.Ct.App.2000), *trans. denied*. If a search is conducted in the absence of a warrant, the State bears the burden of proving an exception to the warrant requirement. *Id.* Search and seizure violations under Article I, Section 11 of the Indiana constitution are analyzed differently. *Id.* at 208–09. The State must show that, under the totality of the circumstances, the police behavior was reasonable. *Id.* at 209. However, because we find Jackson's challenge under the Fourth Amendment to be dispositive, it is unnecessary for us to address his challenge under the Indiana Constitution.

Our standard of review for the denial of a motion to suppress evidence is similar to other sufficiency issues. *Ammons v. State*, 770 N.E.2d 927, 930 (Ind.Ct. App.2002), *trans. denied*. We determine whether substantial evidence of probative value exists to support the trial court's denial of the motion. *Id.* We do not reweigh the evidence, and we consider conflicting evidence that is most favorable to the trial court's ruling. *Id.* However, the review of a denial of a motion to suppress is different from other sufficiency matters in that we must also consider uncontested evidence that is favorable to the defendant. *Id.; see also Swanson*, 730 N.E.2d at 209.

### I. Initial Traffic Stop

Jackson asserts that the initial traffic stop was improper because there

---

2. Ind.Code §§ 35–47–2–1, 35–47–2–23(c).

3. I.C. §§ 35–47–2–1, 35–47–2–23(c)(2).

4. Ind.Code § 35–50–2–8.

were insufficient facts to support the stop. We disagree. Police officers may stop a vehicle when they observe minor traffic violations. *Smith v. State,* 713 N.E.2d 338, 342 (Ind.Ct.App.1999), *trans. denied; see also* Ind.Code § 34–28–5–3. A stop is lawful if there is an objectively justifiable reason for it, and the stop may be justified on less than probable cause. *Ransom v. State,* 741 N.E.2d 419, 421 (Ind.Ct.App. 2000), *trans. denied.* If there is an objectively justifiable reason for the stop, then the stop is valid whether or not the police officer would have otherwise made the stop but for ulterior suspicions or motives. *Smith,* 713 N.E.2d at 342.

In this case, Officer Krider testified that he stopped Jackson because he observed Jackson driving his car northbound in the middle lane of Fall Creek Parkway while the northbound middle lane faced a lane use control signal displaying a red "X" indicating that the lane was closed to northbound traffic. Indiana Code § 9–21–3–9 provides:

> When lane use control signals are placed over individual lanes, the signals apply to vehicular traffic as follows:
>
> (1) Green indication (downward green arrows) means vehicular traffic may travel in any lane over which a green signal is shown.
>
> (2) Steady yellow indication (yellow X symbol) means vehicular traffic is warned that a lane control change is being made.
>
> (3) Steady red indication (red X symbol) means vehicular traffic may not enter or travel in a lane over which a red signal is shown.
>
> (4) Flashing yellow indication (yellow X symbol) means vehicular traffic may use the lane only for the purpose of approaching and making a left turn.

A person who violates Indiana Code § 9–21–3–9 commits a Class C infraction. Ind. Code § 9–21–3–11.

In arguing that the initial traffic stop was improper, Jackson directs us to the testimony of James Rosa, an employee for the Indianapolis Department of Public Works. At the hearing on the motion to reconsider the motion to suppress, Rosa testified that the middle lane of Fall Creek Parkway changes directions twice a day and that the northbound lane use control signals then displayed a green arrow from noon to 11:30 p.m. According to Rosa, there were no reported malfunctions of the Fall Creek Parkway lane use control signals on November 10, 1997.

Jackson asserts that based on Rosa's testimony there is no objectively justifiable reason for the traffic stop because at 12:10 p.m.—the time of the traffic stop—the northbound middle lane of Fall Creek Parkway should have faced a green arrow and been open to traffic. However, Jackson's argument is simply an invitation for us to reweigh the evidence, which is an invitation that we must refuse. Officer Krider testified that at 12:10 p.m. on November 10, 1997, he observed Jackson driving his car northbound in the middle lane of Fall Creek Parkway while the lane use control signals displayed red "X's". While Rosa's testimony concerning the normal schedule of the lane use control signals does conflict with the time indicated by Officer Krider for the stop, Officer Krider was certain that the lane use control signals displayed a red "X" for northbound traffic when he observed Jackson driving in the middle lane. As we must consider the conflicting evidence that is most favorable to the trial court's ruling, we find that the lane use control signals displayed a red "X" for northbound traffic at the time of the initial traffic stop. Because failing to follow a lane use control

signal is a traffic violation, we find that Officer Krider's observation that Jackson was driving northbound in the middle lane of Fall Creek Parkway while the lane use control signals for the middle lane displayed a red "X" rendered the initial traffic stop valid.

## II. Protective Search

■■■ Jackson also argues that even if the initial traffic stop was valid, the trial court still should have suppressed the handgun because police officers exceeded the scope of the stop by conducting multiple protective searches of Jackson's car. The Fourth Amendment allows privacy interests protected by the Fourth Amendment to be balanced against the interests of officer safety. *Wilson v. State*, 745 N.E.2d 789, 792 (Ind.2001); *see also Knowles v. Iowa*, 525 U.S. 113, 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). In *Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the United States Supreme Court provided:

> Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

463 U.S. at 1049–50, 103 S.Ct. 3469 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The Supreme Court stressed that police officers are not required to adopt alternate means to ensure their safety in order to avoid privacy intrusions in this type of *Terry* investigation because it involves "a police investigation 'at close range,' when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger....'" *Long*, 463 U.S. at 1052, 103 S.Ct. 3469 (quoting *Terry*, 392 U.S. at 24, 28, 88 S.Ct. 1868).

■■■ As this Court has noted, "The purpose of a limited search for weapons after an investigative stop is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear for his safety or the safety of others." *State v. Joe*, 693 N.E.2d 573, 575 (Ind.Ct. App.1998), *reh'g denied, trans. denied.* Therefore, when a vehicle has been properly stopped for investigative purposes, if the officer reasonably believes that he or others may be in danger, he may conduct a limited search of the automobile's interior for weapons without first obtaining a search warrant. *State v. Dodson*, 733 N.E.2d 968, 971 (Ind.Ct.App.2000), *reh'g denied.*

In this case, Officer Krider testified that after the initial stop, Jackson began "furiously moving around inside the vehicle." Tr. p. 206. Officers Krider and Turk also testified that Jackson initially hesitated to follow their commands to raise his hands in the air. Jackson only complied after the police officers had repeated their de-

mands and drawn their guns. Officer Krider testified that Jackson's movements made him worried that Jackson might have a weapon. Based on this evidence, we agree that Jackson's actions gave rise to a reasonable belief that a limited search of the interior of his car for weapons was necessary to ensure the officers' safety. *See Dodson,* 733 N.E.2d at 972; *Joe,* 693 N.E.2d at 575. However, we find that the police officers' use of multiple protective searches exceeded the rationale behind a *Terry*-type investigation and was therefore unreasonable.

After ordering Jackson out of his car, Officer Krider conducted a patdown search of Jackson, which revealed no weapons. Despite not finding a weapon on Jackson, the officers were justified in conducting a limited search of the interior of his car for weapons. Officer Brannon conducted such a search with his canine. It was only after Officer Brannon conducted this canine search and discovered no weapons inside the car that Officer Krider then instructed Officer Butler to perform a search of Jackson's car.

While we find that Jackson's actions while inside his car could have caused the officers to reasonably believe that they may have been in danger, we find that the reasonability of this belief diminished after the patdown search and canine search discovered no weapons. Concern for officer safety is an important interest that should be balanced against a defendant's privacy interests protected by the Fourth Amendment; however, there reaches a point where the scales begin to tip again in favor of securing a defendant's privacy interests. In this case, after two unproductive protective searches, we find that it was no longer reasonable for Officer Krider to instruct Officer Butler to conduct another search of Jackson's car. Therefore, we find that the search went beyond the limit-

ed protective search allowed under *Terry* and *Long,* and we conclude that the trial court abused its discretion in failing to suppress the handgun found during that search.

Judgment reversed and remanded for proceedings consistent with this opinion.

DARDEN, J., and NAJAM, J., concur.